[Crim. No. 4918. Second Dist., Div. Two. Apr. 3, 1953.]

THE PEOPLE, Respondent, v. JOHN COLLINS, Appellant.

John Collins, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

MOORE, P. J.—Appellant was accused by information of five felonies: (1) assault with a deadly weapon with intent to commit murder upon Joseph Burger; (2) burglary of the home of Joseph and Lillian Burger; (3) robbery of Joseph Burger by taking a $2,000 ring from his person; (4) grand theft by taking $19,000 worth of jewelry and money from Joseph and Lillian Burger and (5) assault with a deadly weapon upon Lillian Burger. In addition thereto, it was charged as to each count that appellant had been convicted in a county court of New York state of robbery and had served a term of imprisonment therefor in the state prison. Being without funds, a deputy public defender was appointed to defend him, but after about one month's service was relieved of the assignment and appellant thereafter represented himself. A jury

found him guilty of (1) assault with a deadly weapon, a lesser included offense, (2) burglary in the first degree, (4) grand theft, and (5) assault with a deadly weapon, but not guilty of robbery (count 3). He was found to have suffered a prior conviction of a felony and a term of imprisonment. Probation was denied and he was sentenced for the term prescribed by law on all four counts of which he stood convicted, the sentences on 1 and 2 to run consecutively, and count 4 to run consecutively to counts 1 and 2; and count 5 to run consecutively to counts 1, 2 and 4.

On this appeal reversal is demanded on the grounds of insufficiency of the evidence; irregularity in the arraignment; denial of due process of law; errors in the rulings of the court at the trial.

## EVIDENCE SUFFICIENT

■ Joseph Burger is an auctioneer. He and his wife Lillian arrived at their home about 12:30 a.m., February 18, 1952. They brought two suitcases of diamonds, watches and money. Mr. Burger had been working with jewelry for more than 35 years and was familiar with values of his merchandise. They retired about 1 in the morning. Mrs. Burger was awakened about 3 a.m., to find her head in pain and herself on the floor, evidently caused by the strange man then beating her husband. She made her escape to the home of Mr. Buckridge, a neighbor who immediately called the police, then went to the Burger home and found it in a state of confusion and blood on the wall. One screen was propped open with a pillow. The ambulance took the Burgers to the hospital where they were confined for two weeks. They were examined by three physicians. Mr. Burger had multiple scalp lacerations, ecchymosis and swelling on face and over his shoulders. right forearm, left wrist, left foot and right knee. His nose, his jawbone and his zygoma had all been fractured. The wounds on his head were deep and multiple and in the opinion of the physicians had been caused by the application of external force. The injuries to Mrs. Burger were similar. She had blood in the left eye and a zygomatic fracture, and suffered injuries to her neck, hip, right foot and lower spine, all of which had been caused by the application of considerable external force.

The instrumentality used by the assailant is identified by the fact that Mrs. Burger had standing on her dining room table a pair of silver candlesticks. At the time of the trial one of them bore a reddish brown stain.

No one had been given permission to enter the Burger home. About two weeks prior to the burglary, the maid in the household saw appellant near the garage about 8 o'clock in the evening and again at 10 p.m. On February 16th he called to collect papers.

As soon as the alarm reached the police, patrol officers Lacher and Randolph proceeded toward the Burger residence. Two blocks west of there they saw the parking lights of a sedan. As the officers approached it, a man came from behind, entered the front seat and drove rapidly toward the patrolmen. Officer Lacher turned on his red lights and headed straight toward the sedan, but by a sudden burst of power it drove around them. The officers made a U-turn and began the chase. Officers Giroux and Niediewski, hearing the broadcast, joined in the pursuit. The elusive sedan going at a speed of about 55 miles per hour failed in making a turn and struck a signal light standard. As Officer Lacher drove straight to the sedan he saw appellant jump out and run. He was captured about 50 yards away. He wore blue trousers, a beige knit sweater and was without shoes.

The trunk compartment of the sedan opened in the crash and a suitcase had fallen to the pavement and lay open. It contained diamond rings and a canvas sack with money. The suitcase which remained in the trunk compartment contained watches in boxes. These were the suitcases which had been taken from the Burger residence.

Officers Giroux and Niediewski visited the Burger residence. They found the bedroom disarranged and spattered with blood, some soil on the floor and a broken urn. Also, Giroux found the shaft of a candlestick lying opposite the living room door with a reddish brown substance which was found to be human blood by Mr. Ray Pinker, technical director of the scientific crime investigation laboratory of the Los Angeles Police Department. Also, he found the sweater and trousers of appellant had human blood on the cuff of the sweater and on the front of the left trouser leg. He found that the five waddings of cotton contained human blood. The waddings had been used with water by Officer Jones to remove the stains from defendant's hands, wrists and right foot.

Officer Jones visited the Burger residence at 1 p. m. He found stains of dried blood from the doorway into the bedroom. They seemed to terminate at the northeast corner of the bedroom next to the bed where there was dry blood, pieces of broken pottery, dirt, and glass—apparently a mirror. He found

a blue coat button under the bed similar to that found by Officer Giroux. He found a hole in the screen which was open in the den, and a bookcase pushed away from the window.

The fingerprint experts of the Los Angeles Police Department identified a photograph of a partial palm print taken from the windowsill in the Burgers' den as that of appellant. It was identical with the impression obtained from the defendant at the Venice jail on February 21 in 20 points. Only 10 points of similarity are essential to a satisfactory identification. Fingerprint impressions of the defendant were identical with the fingerprints forwarded from a New York prison as being the prints of John William Collins.

Appellant gave rambling, fantastic and unconvincing testimony of his movements on the morning of February 18th. His statement that he had been beaten and kicked in the face and stomach when arrested was refuted by the police officers to the satisfaction of the jury. Also, Dr. Miller, a licensed physician, examined appellant at 5:40 a. m. on February 18th and found that no clothing had been removed, no evidence of physical injury appeared, but appellant lay writhing, moaning and unresponsive to questions. On February 26th appellant was examined by Dr. Grover Christensen, a licensed physician and surgeon, who found no evidence of the defendant's having been beaten on the face or head or abdominal wall.

From the foregoing facts there could be no reasonable doubt of the guilt of appellant. The weight to be given to the testimony and the credibility of witnesses are matters for the jury and their finding upon such matters cannot be set aside on appeal unless it can be shown that there was no evidence which as a matter of law would justify the conviction. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Thomas,* 103 Cal.App.2d 669, 672 [229 P.2d 836].) The asserted inconsistencies in the testimony such as Mrs. Burger's statement that the burglar wore heavy shoes with which he kicked her, the finding of a hat in the Burger bedroom of the size 7¼ whereas defendant claims to have worn size 7, are petty criticisms of the record and do not affect the general finding of the jury as to the sufficiency of the evidence generally to support the conviction.

## Due Process Not Denied

Appellant makes a number of assignments involving due process. He contends that at the time of his arrest he was

beaten by the officers to force him to sign a confession and he complains that there was a delay in taking him before a magistrate for hearing. There is no proof in the record of any delay in bringing him before the committing magistrate or in the filing of an information. On February 27th his preliminary examination was continued to March 5th on which day the commitment was signed. But conceding appellant's contention as to a delay in presenting him before the magistrate (Pen. Code, § 825), no prejudice appears to have been suffered thereby. His trial in the superior court was without event that might have arisen from a delay in presenting him to the municipal judge. (*People* v. *Stroble,* 36 Cal.2d 615, 626 [226 P.2d 330], affirmed, *Stroble* v. *California,* 343 U.S. 181 [72 S.Ct. 599, 96 L.Ed. 872].) All delays that occurred and all continuances that were granted at the preliminary hearing are presumed to have been with appellant's consent in the absence of proof to the contrary. Moreover, errors committed by the examining magistrate, if any, cannot constitute reversible error on appeal for the reason that they could not affect the jurisdiction of the superior court, after appellant's due and prompt committal. (*People* v. *Stuckrath,* 64 Cal.App. 84, 87 [220 P. 433].) Neither was there any delay in the filing of the information. The commitment of appellant was signed on March 5th; the information was filed on March 20th. (Pen. Code, § 809.) But if there were any merit in appellant's complaint on this score, it would have been lost by his failure to present a motion in the superior court for a dismissal of the action. (*People* v. *Ganger,* 97 Cal.App.2d 11, 12, 13 [217 P.2d 41].)

Appellant contends that the information does "not aver that the alleged burglary was committed in the night-time" which he says is an essential fact to constitute a first degree burglary. Also, he urges that it was necessary to allege the size, type or name of the weapon used in committing the assaults with a deadly weapon. It is not necessary to allege the time or degree of the burglary. (*People* v. *Walsh,* 75 Cal.App. 434, 435, 436 [243 P. 31].) Neither is it essential to allege the type of weapon used by the accused. (*People* v. *De La Roi,* 23 Cal.2d 692, 697 [146 P.2d 225, 151 P.2d 837].) However, after the information had been filed without alleging the type of weapon used in the assaults made, appellant's remedy was to move for a dismissal of the two counts for assault with a deadly weapon,

based upon the evidence or lack of it before the examining magistrate.

Appellant complains that a deputy public defender was appointed to represent him; that in his consultation with the lawyer, the latter undertook to persuade him to plead guilty; that when the deputy declined to act unless appellant would abstain from examining the witnesses, the officer on his own motion was relieved from further representing appellant. The latter now complains that the court did not offer to appoint other counsel and that such conduct is a denial of due process of law. In support of his proposition appellant cites discussions with the deputy that are not a part of the record. They cannot therefore be considered. (*People* v. *Ruiz*, 103 Cal.App.2d 146, 149, 150 [229 P.2d 73].) ■ Unsworn statements of appellant as to purported occurrences which were not before the trial court for consideration cannot be reviewed on appeal. (Ibid.) But even if the record warranted an inquiry into the alleged refusal of the court to appoint a second attorney to conduct the defense, how could it be known that any other lawyer would have accepted the task? It has been judicially declared that the public defender of Los Angeles County and his staff have higher than average ability in defending criminal actions. (*People* v. *Adamson*, 34 Cal.2d 320, 333 [210 P.2d 13].) As to the "refusal" of the trial court to appoint another lawyer to represent appellant, the court was not obliged to force appellant to accept the service of other counsel after his unjustifiable refusal to permit the deputy public defender to conduct the trial. Relative to his complaint that the court refused to appoint other counsel, it is pertinent to observe that on the very first day of the trial the judge said to appellant, "You refused counsel, and I tried to talk you into having counsel and if you had counsel you would know how to go about this . . . I was trying to do my best to have you to have counsel and you refused it . . . that is why, I told you before you should have an attorney and that is why I tried my best to get you to have an attorney . . . this is a serious charge that is against you and I tried to insist on your getting an attorney. . . ." In reply thereto appellant gave no indication that he desired the appointment of counsel but displayed an apparent zeal to act on his own behalf. From such record it is clear that appellant's complaint suggests no ground for reversal. ■ Where a defendant requests permission to conduct his own trial, he cannot complain of

the court's failure to appoint counsel for him. (*People* v. *Acosta,* 114 Cal.App.2d 1, 4 [249 P.2d 316].)

█ Assignment is made of the court's conduct in conferring with appellant and the prosecuting attorney in chambers before the commencement of the trial. Such conference was not a part of the "trial." On the contrary, it was a conference with a view to abbreviating the trial and of minimizing the detriment that might be suffered by appellant in the event he should insist upon his denial of a prior conviction. In that conference the court explained that if appellant denied the prior conviction, the district attorney might refer to it at any time during the trial, but if appellant admitted it, the prosecutor could question appellant about it only in the event appellant should take the witness stand and that there was no compulsion for him to testify. "If we go to trial," said the judge, "with the way the record is with a denial of the prior, he has a right to tell the jury that you suffered a prior conviction for robbery in the state of New York in 1933, so you have got to make up your mind before you go to trial." Such statement of the judge was outside the hearing of the jury. No prejudice was caused by such remarks, nor is there any basis for the claim of prejudice suffered.

█ In this connection appellant contends that he should have had a separate jury impaneled to try his alleged prior conviction. Such is not the law. "The whole spirit and intent of these statutes appear to be that a prior conviction charge is to be determined solely as one of the issues in the trial for the new offense." (*People* v. *Ysabel,* 28 Cal.App.2d 259, 263 [82 P.2d 476].)

█ Moreover, no objection was made at the trial to the inclusion of the prior conviction along with the new offenses. Hence, it is not a subject for review. (*People* v. *Acosta, supra,* p. 3.)

### Rulings at the Trial

Appellant assigns as error the testimony of Officer Bergman, asserting that it was vague and that it fails to prove that the palm prints as shown by the two exhibits were made by the same palm. An examination of the testimony of the officer fails to disclose any inconsistency or lack of intelligent observation on the part of the witness. █ The 20 points of similarity between the palm print found on the windowsill and appellant's palm print are conclusive, but

184

inasmuch as the entire record discloses sufficient proof of appellant's guilt without the testimony of Officer Bergman, it is immaterial whether such testimony be included.

As to appellant's complaint that the court failed to instruct the jury on expert testimony, the answer is that no part of the instructions are included in the record.

■ Assignment is made of the admission in evidence of a "purported written application" of defendant for a registration certificate without proof that the document bore the signature of appellant. Thereby he contends the prosecution failed to prove his ownership of the car that was wrecked by appellant on the morning of the crimes. Ownership was sufficiently proved without resort to the application for a registration certificate. Officer Lacher testified that defendant was driving the automobile bearing number 1 T 20081. When the certified copy of the original registration of the car bearing such number was introduced, appellant called into question the signature on that instrument. The trial judge held the document admissible as a public record. Since appellant did not testify with reference to his signature thereon, no prejudice could have resulted from the admission of the exhibit. No objection was made to it, and no motion was made to strike it from the evidence. His complaints in this court are therefore too late.

Appellant complains that he was denied process to compel attendance of witnesses. He says that he "asked the doctor to find out the name of the nurse and give it to the court so she could be subpoenaed"; that the court promised to give the subpoena to the sheriff, but, instead, the subpoena was given to appellant for delivery to the sheriff. He asked the guards to deliver it to the sheriff and they refused to do so. Nothing is contained in the statements of appellant to indicate that he was denied process to enforce the attendance of witnesses. ■ Matters outside the record may not be considered. (*People* v. *Ruiz, supra.*)

### No Error in Instruction's Shown

Complaint is made of the court's not giving instructions with reference to burglary and deadly weapons. Since the instructions are not before the court, they cannot be considered.

■ Appellant's claim that there is no proof that the burglary occurred in the nighttime and that the weapon was not introduced overlooks the facts that the testimony of the witnesses proves that the burglary and the assault occurred

about 3 o'clock on the morning of February 18th, and that a number of witnesses testified that Mr. and Mrs. Burger were struck with an instrument sufficiently heavy to cause fractures of their bones. Whether such injuries were caused by a bludgeon imported by appellant or by the silver candlesticks from the dining room table, the jury found that the Burgers were struck with deadly instruments. That 3 in the morning is nighttime in this latitude is a subject of judicial notice.

### No Misconduct of the Court

 Complaint is made that the court interfered with appellant's efforts in conducting the trial. The court was occupied with requiring appellant to ask questions in an orderly fashion, in rejecting improper offers of immaterial evidence and in trying to prevent repetitions. All such conduct was the normal effort of a wise and efficient jurist in enforcing a procedure designed to develop the truth. Appellant may not now argue the demerits of the court's admission of photographs of the accident after his failure to object at the trial; nor attempt to persuade this court of the error in allowing a witness to complete a hearsay answer before excluding it. Those rulings were made without an objection by appellant. These and other similar assignments are hopelessly futile because no basis for them was laid by appropriate and timely objections.

Judgment affirmed.

McComb, J., and Fox, J., concurred.

A petition for a rehearing was denied April 15, 1953, and appellant's petition for a hearing by the Supreme Court was denied April 30, 1953.